CONTAINERPORT GROUP,
INC., Plaintiff,

v.

AMERICAN FINANCIAL GROUP,
INC., Defendant.

No. C2-95-1262.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 16, 2001.

Katerina M Eftimoff, Porter Wright Morris & Arthur, Columbus, OH, Daniel F. Gourash, Porter Wright Morris & Arthur, Cleveland, OH, for Containerport Group Inc.

Jonathan A Cote, Pierce E Cunningham, Cincinnati, OH, Pierce Edward Cunningham, Jonathan A Conte, Cincinnati, OH, for American Financial Group, Inc.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

Plaintiff ultimately seeks to recover from Defendant costs incurred in cleaning up environmental contamination on land Plaintiff's predecessor-in-interest bought from Defendant's predecessor-in-interest. Plaintiff brings this action under §§ 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. § 9601 *et seq.* Plaintiff is seeking a declaratory judgment as to Defendant's liability for past and future response costs. This matter is currently before the Court on cross motions for summary judgment.

### I. Background

From 1901 until 1985, Penn Central Corporation owned and operated a rail-yard and rail siding facility on Camden Avenue in Columbus, Ohio.[1] In July of 1985, Rail Container Services, Inc., Plaintiff's predecessor corporation, purchased eighteen acres of this real estate from Penn Central for $128,695. Prior to purchasing the property, Plaintiff did not conduct an environmental assessment, and at no time did Penn Central notify Plaintiff that it had placed hazardous substances on

1. Defendant American Financial Group, Inc. has been formerly known as American Premier Underwriters, Inc., The Penn Central Corp., Penn Central Transportation Co., and The Cleveland, Cincinnati, Chicago and St. Louis Railway Co.

the property. For the next five years, Plaintiff used the site principally to store empty shipping containers. It contends that it engaged in no operations involving hazardous substances or the disposal of hazardous waste on the property during this time. In 1990, it no longer needed the site for storage space and placed the property, which was zoned for manufacturing, up for sale.

In 1993, the Columbus Chapter of Habitat for Humanity began negotiating with Plaintiff for the purchase of the property, hoping to use it for single family homes. Habitat for Humanity retained Sharp & Associates, an environmental consulting firm, to conduct a "Phase I" environmental site assessment. The assessment revealed no obvious hazardous waste problems, but did reveal the presence of fill material of an unknown origin on the western portion of the property. (Ex. 2 to Pl.'s Mot. Summ.J.). Based on this assessment, Habitat for Humanity hired BBC & M, another environmental consulting firm, to conduct a "Phase II" assessment. Plaintiff agreed that if, based on that assessment, Habitat for Humanity chose not to purchase the property, Plaintiff would pay one-half of the cost of the Phase II assessment.

The Phase II assessment revealed that the fill appeared to be "a coal combustion by-product, such as bottom ash or boiler slag" and contained several metals classified as hazardous substances under CERCLA. (Ex. 5 to Pl.'s Mot.Summ.J.). Specifically, the study found levels of cadmium, lead, and copper that exceeded the Upper Confidence Levels for Ohio Farm Soils. In addition, levels of arsenic were approximately ten times greater than the Superfund Proposed Screening Levels for Heavy Metals. BBC & M estimated that it would cost Habitat for Humanity $200,000 to $980,590 to remedy the problems before building could begin. Slag was found on approximately fourteen of the eighteen acres. The average depth was 2.1 feet. (Ex. 6 to Pl.'s Mot.Summ.J.).

Possible solutions included covering the ground with additional fill material or removing the fill material from the site and disposing of it elsewhere.

Based on this report, Habitat for Humanity decided not to purchase the property. As agreed, Plaintiff paid half of the cost of the Phase II assessment. Plaintiff then filed this action asking for a declaratory judgment that Defendant is strictly liable for past and future response costs under CERCLA as a prior owner and operator of the site at the time hazardous wastes were disposed of, and/or as a generator of, or arranger for, the disposal of hazardous substances at the site. Defendant filed a counterclaim alleging that Plaintiff, as the current owner of the property, is jointly and severally liable for response costs incurred in clean-up of the site. Although no response plan has yet been implemented, Plaintiff has incurred over $12,000 in costs including the site assessments, the slag remediation study, legal fees incurred in identifying responsible parties, and related expert services and property analyses. Both parties have filed motions for summary judgment.

## II. Standard for Granting Summary Judgment

Federal Rule of Civil Procedure 56(c) provides:

> [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original);

*Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)); *accord County of Oakland v. City of Berkley,* 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for what was formerly referred to as a directed verdict. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

"The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455–56 (6th Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes,* 398 U.S. at 157–60, 90 S.Ct. 1598.

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

## III. Discussion

### A. Plaintiff's Motion for Summary Judgment

#### 1. CERCLA Liability

The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") was enacted to provide the tools needed to address the problems of hazardous waste disposal. In enacting CERCLA, Congress intended that those responsible for the problems caused by the treatment and disposal of hazardous waste "bear the costs and responsibility for remedying the harmful conditions they created." *Walls v. Waste Resource Corp.*, 823 F.2d 977, 980 (6th Cir.1987) (*quoting United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.Minn.1982)). CERCLA is a strict liability statute. *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348 (6th Cir. 1998); *United States v. Township of Brighton*, 153 F.3d 307, 312 (6th Cir.1998).

CERCLA provides two avenues by which private parties who have incurred response costs in connection with the clean-up of a hazardous waste site may recover all, or some, of their costs. First, 42 U.S.C. § 9607(a) authorizes the government and innocent private parties to recover all response costs from those responsible for the contamination. Absent a showing that the harm is divisible, it establishes joint and several liability. Second, 42 U.S.C. § 9613(f) allows persons who are themselves responsible parties to seek contribution from others who are also responsible for the release of hazardous substances. It states: "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title ..." Under § 9613(f), defendants are liable only for the portion of the harm they caused. *Sun Co., Inc. v. Browning–Ferris, Inc.*, 124 F.3d 1187, 1193 (10th Cir.1997). Plaintiffs in this case seek to recover costs under both § 9607 and § 9613. Liability under either section rests on the four elements set forth in § 9607(a):

(1) There was a release or threatened release of a hazardous substance;[2]

(2) The site of the release or threatened release is a "facility" as that term is defined in the statute;[3]

(3) The release or threatened release caused Plaintiff to incur response costs; and

(4) Defendant is among the four statutory classes of persons subject to liability.

*Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999) (citing 42 U.S.C. § 9607(a)). Those classes of persons subject to liability include:

(1) the owner and operator of a vessel or facility;

**2.** A "release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). CERCLA imposes no quantitative requirement. As long as there has been a "release" of a contaminant listed as a "hazardous substance" in 40 C.F.R. § 302.4(a), this element is met. *Mid Valley Bank v. North Valley Bank*, 764 F.Supp. 1377, 1386 (E.D.Cal.1991). Arsenic, cadmium, copper, and lead are all designated as "hazardous substances."

**3.** A "facility" is broadly defined as "any building ... or ... any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances;[4] and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a).

Once a prima facie case is established, summary judgment on the issue of liability is appropriate unless a defendant can establish, by a preponderance of the evidence, that the release or threatened release was caused solely by:

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ..., if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b).[5]

■ Plaintiff claims that it is entitled to summary judgment on the issue of Defen-

4. The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters. 42 U.S.C. § 6903(3).

5. 42 U.S.C. § 9603(35) defines the term "contractual relationship" as used in § 9607(b)(3) as follows:

(A) ... includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:
(i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.
(ii) The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.
(iii) The defendant acquired the facility by inheritance or bequest.
In addition to establishing the foregoing, the defendant must establish that he has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title.
(B) To establish that the defendant had no reason to know, as provided in clause (i) of subparagraph (A) of this paragraph, the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to

dant's liability. It contends that Defendant is strictly liable because: 1) a "release" of arsenic, cadmium, copper, and lead, all designated hazardous substances, has occurred; 2) the site in question is a "facility" since hazardous waste has been "deposited, stored, disposed of, or placed, or otherwise come to be located" on the property; 3) the release has caused Plaintiff to incur response costs; and 4) Defendant is subject to liability since it owned or operated the facility when the hazardous waste was disposed of, and either placed the hazardous waste on the site or arranged for someone else to place it there. Defendant has not asserted any affirmative defenses.[6]

■ The Court agrees that the first three elements have been satisfied. However, since it is not clear exactly when the fill material containing the hazardous substances was placed on the site, Plaintiff has not established that Defendant is among the classes of persons subject to liability. Plaintiff has presented no affirmative evidence indicating that hazardous materials were placed on the site while Penn Central owned the property. Instead, Plaintiff has presented an affidavit of Russel Graef, the Vice President of Containerport Group, Inc. Mr. Graef avers that, after Plaintiff bought the property, it did not place bottom ash, fly ash, cinders, or boiler slag on the site. Neither has Plaintiff disposed of, or arranged for the disposal of, any hazardous substances on the property. (Graef Aff. ¶¶ 5–6, Ex. 7 to Pl.'s Mot.Summ.J.). He also states that the property is in essentially the same condition today as when it was purchased in 1985. (Graef Aff. ¶ 9). Based on this affidavit, Plaintiff concludes that the hazardous substances must have already been there when it purchased the property from Penn Central in 1985. Since Penn Central owned the property for nearly a century before Plaintiff purchased it, Plaintiff claims that it is "logical and reasonable to infer" that Penn Central is responsible for the presence of the hazardous substances on the site. (Pl.'s Mot.Summ.J. at 7).

In support, Plaintiff cites *Dartron Corp. v. Uniroyal Chemical Co.*, 893 F.Supp. 730 (N.D.Ohio 1995). In that case, years after Dartron Corporation purchased property from Uniroyal, Dartron discovered that the property was contaminated with hazardous substances. Dartron sought to hold Uniroyal liable for the clean-up costs, but had no direct evidence that hazardous substances were disposed of on the property during the time Uniroyal owned the land. Despite the lack of affirmative evidence, the court found that the plaintiff was entitled to summary judgment. Unrefuted evidence showed that Uniroyal's manufacturing operations had produced sludge containing high levels of mercury and vinyl chloride. This sludge was transported through sewer lines to settling ba-

the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.
(C) Nothing in this paragraph or in section 9607(b)(3) of this title shall diminish the liability of any previous owner or operator of such facility who would otherwise be liable under this chapter. Notwithstanding this paragraph, if the defendant obtained actual knowledge of the release or threatened release of a hazardous substance at such facility when the defendant owned the real property and then subsequently transferred ownership of the property to another person without disclosing such knowledge, such defendant shall be treated as liable under section 9607(a)(1) of this title and no defense under section 9607(b)(3) of this title shall be available to such defendant.
(D) Nothing in this paragraph shall affect the liability under this chapter of a defendant who, by any act or omission, caused or contributed to the release or threatened release of a hazardous substance which is the subject of the action relating to the facility.

6. Plaintiff correctly notes that the fact that Defendant gave Plaintiff a quitclaim deed and sold the property "as is" does not negate strict liability under CERCLA. *M & M Realty Co. v. Eberton Terminal Corp.*, 977 F.Supp. 683, 688 (M.D.Pa.1997).

sins on the property; the highest concentrations of these chemicals were found along Uniroyal's old sewer lines. Based on this evidence, the Court held that logic could lead to no other conclusion than that Uniroyal owned or operated the facility at the time of disposal. *Id.* at 735.

This case, however, is not as clear cut. Most importantly, there is no evidence that Penn Central engaged in any type of manufacturing activity that produced the hazardous materials found at the site. Instead, the heavy concentrations of metals were found in "fill material" which was, presumably, brought onto the site from another location. As Defendant notes in its response, it is possible that this fill material was placed on the site between the time Plaintiff purchased the property and the time the assessment was done.[7] Plaintiff's own witness, Mr. Graef, testified that gravel, stone and dirt were periodically brought onto the property to fill in low areas. (Graef Dep. at 54). Although it is not clear from the record, in the Court's view, it is certainly possible that this fill could have been the same material later found to contain the heavy concentrations of metals.

In addition, since Plaintiff purchased the land, third parties have had ample opportunity to gain access to the property. Mr. Graef testified that from 1985 until 1989, while Containerport was using the land for storage, two or three employees were present on the site during business hours. By stacking storage containers end to end, Plaintiff constructed a makeshift "fence" around three sides of the portion of the property where it stored its containers; the fourth side, which abutted the railroad tracks, was left accessible at all times. Employees blocked the driveway to the property with another container each evening. However, the remainder of the property which was not used for storage was not fenced in. (Graef Dep. at 49–51). It is unclear from the record where the contaminated soil was found in relationship to this "fenced" area. However, it appears possible that a third party could have gained access to the fenced area after business hours either by moving the container that blocked the driveway or by entering on the side of the property abutting the railroad tracks. In addition, Plaintiff leased one acre of the property to Columbus Refuse for several years for the storage of empty equipment, providing yet another opportunity for a third party to gain access to the property. (Exs. 6–7 to Graef Dep.).

The property has now been vacant since 1990. (Graef Aff. ¶ 4). The Court notes that this land has a history of being used as a dumping ground. James Lawrence, Defendant's marketing representative who negotiated the sale of the property to Plaintiff, testified that trash dumping had been an "ongoing problem." (Lawrence Dep. at 48). In 1983, the Columbus Health Department ordered Defendant to clean up the site, which was littered with bricks, lumber, and construction material. (*Id.* at 23). Defendant spent $15,000 to do so. (Ex. 5 to Lawrence Dep.). Frederick Hunger, the President of World Shipping, Plaintiff's parent company, testified that since Containerport ceased operations in 1990, there has been no security on the site. (Hunger Dep. at 30). John Payne, an environmental consultant, stated that when he visited the property in 1999, access to the property was not limited in any way. He noticed "the presence of significant amounts of solid waste and other debris strewn across the site." (Payne Aff. ¶ 7, Ex. 2 to Pl.'s Mot.Summ.J.). While the trash and other debris is distinguishable from the "fill material" that contained the heavy concentrations of various

---

**7.** Plaintiff claims that since Defendant's memorandum in opposition to Plaintiff's motion for summary judgment was filed six days late, it should be stricken as untimely. While the Court admonishes Defendant for failing to file its response in a timely manner, Plaintiff has claimed no prejudice as a result of the short delay. The Court will therefore consider Defendant's response.

metals, a reasonable jury-could infer that third parties have considered this piece of property a place to dispose of whatever they no longer want.

The Court finds that genuine issues of material fact exist concerning when the hazardous substances were disposed of on the property in question. Plaintiff has presented no evidence that the hazardous substances were disposed of when Penn Central owned the land, and logic does not necessarily dictate that the hazardous substances were already present when Plaintiff purchased the property in 1985. The possibility exists that the hazardous substances were disposed of while Containerport was using the site for storage. More importantly, from the time Containerport ceased storage on the site in 1989 until the site assessments were conducted in 1993 and 1994, anyone could have freely accessed the property to dispose of the hazardous material in question. Defendant has presented sufficient evidence to create a genuine issue of material fact concerning whether it either: 1) owned the property when the hazardous materials were disposed of; or 2) arranged for the disposal of hazardous materials on the site. For this reason, summary judgment concerning the issue of Defendant's liability is inappropriate.

### 2. Plaintiff's Right to Recover Under § 9607 or § 9613: The Innocent Landowner Defense

As noted earlier, Plaintiff seeks to hold Defendant jointly and severally liable for response costs under § 9607, but also seeks contribution from Defendant under § 9613(f). As the Court discussed in its January 7, 1998 Memorandum and Order, normally plaintiffs who are themselves potentially responsible parties are limited to an action for contribution under § 9613. *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 345 (6th Cir. 1998). However, if the plaintiff can establish an affirmative defense, the plaintiff may be able to recover all of its costs under § 9607. *Advanced Technology Corp. v. Eliskim, Inc.*, 87 F.Supp.2d 780, 784 (N.D.Ohio 2000). In this case, Plaintiff, as the current owner of the property, is a potentially responsible party, but has asserted the "innocent landowner" defense.

The "innocent landowner" defense came into being in 1986 with the enactment of SARA. At the time, a third party defense already existed in 42 U.S.C. § 9607(b)(3). As noted earlier, under that section, a potentially responsible party can escape strict liability if it can prove by a preponderance of the evidence that the release of hazardous substances was caused solely by "an act or omission of a third party other than an employee or agent of the [landowner asserting the defense], or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the [landowner] ...," [8] and (a) it "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances," and (b) it "took precautions against foreseeable acts or omissions of any such third party and the consequences

8. The Second Circuit has held that the mere existence of a contractual relationship is insufficient to defeat liability. In order to give effect to the words "in connection with," the statute must be construed to require that the contractual relationship specifically "relate to" the hazardous substance or permit the landowner to exercise control over the third party so that the exercise of due care could have prevented the release. *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*, 964 F.2d 85 (2d Cir.1992). This reading of the statute has been criticized as rendering moot the requirement that a landowner exercise due diligence in purchasing the property, and "dramatically limiting the scope of CERCLA liability." *Goe Engineering Co., Inc. v. Physicians Formula Cosmetics, Inc.*, No. CV 94–3576–WDK, 1997 WL 889278, at *10 n. 7 (C.D.Cal. June 4, 1997). The Sixth Circuit has not addressed this issue and this Court need not decide it either since Plaintiff has failed to establish another necessary element of the defense.

that could foreseeably result from such acts or omissions."

As one court noted, by itself, this third party defense was somewhat useless to subsequent purchasers of contaminated property since the purchaser always had a "contractual relationship" with all predecessors in title, by virtue of a deed. *M & M Realty Co. v. Eberton Terminal Corp.,* 977 F.Supp. 683, 686 (M.D.Pa.1997). Therefore, in order to protect innocent landowners who, in good faith, acquire property without knowledge of the contamination, in SARA, Congress defined a "contractual relationship" to exclude transfers of ownership of land where the owner acquires the land after the disposal of hazardous substances has occurred, and at the time the land was acquired, the Plaintiff did not know, and had no reason to know, of the contamination.[9] 42 U.S.C. § 9601(35)(A). This new definition created what has come to be known as the "innocent landowner" defense.

◼ Under the facts of this case, Plaintiff can establish itself as an "innocent landowner" and state a claim against Defendant for full recovery of costs under § 9607 if it can show, by a preponderance of the evidence that: (1) a third party was the sole cause of the release of hazardous substances; (2) Plaintiff acquired the property after the hazardous substances were disposed of there; (3) at the time Plaintiff bought the property, it did not know that any hazardous substance was deposited there; (4) Plaintiff undertook appropriate inquiry prior to purchasing the property; and (5) once it became aware of the presence of hazardous substances at the site, it exercised due care under the circumstances. *Advanced Technology Corp. v. Eliskim, Inc.,* 87 F.Supp.2d 780, 784–85 (N.D.Ohio 2000); *In re Hemingway Transp., Inc.,* 993 F.2d 915, 932 (1st Cir. 1993).[10]

In January of 1998, the Court refused to grant Defendant's motion to dismiss the § 9607 claim, finding that whether Plaintiff had established the elements of the "innocent landowner" defense was a fact-intensive determination not appropriately resolved in a motion to dismiss. In its memorandum in opposition to Plaintiff's motion for summary judgment, Defendant again argues that Plaintiff has failed to establish that it is an "innocent landowner" and is therefore limited to an action for contribution under § 9613. Defendant claims that Plaintiff is not entitled to the benefits afforded by this defense because it did not conduct a site assessment prior to purchasing the property, did not prevent trespassers from entering the property, and did nothing to decrease the risk to the environment or others once it knew the site was contaminated.

◼ Based on the evidence now in the record, the Court finds that the "innocent landowner" defense is not available to Plaintiff, and that Plaintiff is therefore limited to seeking contribution from Defendant under § 9613. Admittedly, there are still factual disputes concerning who

9. The text of Congress' definition of a "contractual relationship" is set forth in footnote 5 of this opinion.

10. The text of 42 U.S.C. § 9601(35)(A) states that a party seeking to assert the innocent landowner defense must also satisfy the requirements of section 9607(b)(3)(a) and (b). Subsection (a) requires the party to exercise due care with respect to the hazardous substances; subsection (b) requires the party to take precautions against foreseeable acts and omissions of the third parties who disposed of the hazardous substances. Subsection (a) can easily be applied to this case. However, the Court does not comprehend how subsection

(b) could possibly be satisfied because it is completely inconsistent with the other requirements for the defense. In order to establish that there is no "contractual relationship" between the parties that would bar the defense, the plaintiff in this case must prove that it acquired the land *after* the disposal took place. However, if the disposal took place before the plaintiff owned the property, the plaintiff would have neither the right nor the duty to take any precautions against foreseeable acts and omissions of third parties. The Court will therefore ignore the requirement set forth in § 9607(b)(3)(b).

owned the property when the disposal of the hazardous substances took place; these disputes preclude summary judgment on the issue of Defendant's liability. There are also factual questions concerning whether Plaintiff's failure to conduct an environmental site assessment prior to purchasing the property in 1985 bars the defense. However, these are not issues of material fact.

Even if Plaintiff could prove that the release was caused solely by the act or omission of a third party, that the hazardous materials were already on the land when Plaintiff purchased the property, and that Plaintiff had no reason to know of the contamination, Plaintiff cannot show that, once it became aware of the existence of the hazardous substances, it made any attempt to remove them or reduce any possible threat to others or to the environment. While the statute does not require landowners to exercise due care before they know of the presence of hazardous substances, it does require that once landowners are aware of the threat, they take some action. In *Kerr–McGee Chemical v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir.1994), the court found that the "innocent landowner" defense was unavailable where a land purchaser, after becoming aware of contaminants on the property, failed to make any attempt to remove them or reduce any threat they might pose.

This case is analogous to *Kerr–McGee.* Plaintiff became aware of the contamination in 1993 or 1994 when the site assessments were done. However, the record shows that, since that time, the site has sat vacant and is completely accessible to all. Plaintiff has done nothing to secure the site or made any effort to clean up the allegedly hazardous substances. Since Plaintiff has failed to show that it "exercised due care with respect to the hazardous substances," the "innocent landowner"

defense fails. Plaintiff is therefore limited to an action for contribution under § 9613(f).

## B. Defendant's Motion for Summary Judgment

In its motion for summary judgment, Defendant claims that Plaintiff has failed to establish a prima facie case because Plaintiff's response costs are not "necessary" or "consistent with the National Contingency Plan." ("NCP").[11] The NCP is a series of regulations promulgated by the EPA, which govern the clean up of hazardous waste sites. 42 U.S.C. § 9605(a); 40 CFR Part 300. Defendant contends that, since the concentrations of metals present at the site are below the levels the Ohio Environmental Protection Agency ("Ohio EPA") considers hazardous, under no set of facts can Plaintiff show that any of its response costs were, or will be, "necessary" costs "incurred in response to a threat to human health or the environment." *Foster v. United States*, 922 F.Supp. 642, 652–53 (D.D.C.1996). Defendant's argument fails for two reasons: (1) "Necessity" is relevant in terms of which costs are ultimately recoverable, but not to the issue of liability; and (2) state standards may be relevant in determining the extent of clean-up required, but are irrelevant in determining liability under CERCLA.

### 1. "Necessity" of Costs

Defendant claims that because the concentrations of metals at the site are within acceptable levels, no response is needed; therefore none of Plaintiff's alleged response costs can be deemed "necessary." Despite the parties' extensive briefing on this issue, this argument, as it relates to Defendant's potential liability, is premature. In order to establish a prima facie case of CERCLA liability, it is not necessary for Plaintiff to prove that the

11. This same argument also forms another basis for Defendant's response to Plaintiff's

motion for summary judgment.

response costs were "necessary" or "consistent with the NCP." Plaintiff need only show that it incurred costs in response to a release or threatened release of hazardous substances. Whether the costs are "necessary" or "consistent with the NCP" is relevant only in determining which costs are ultimately recoverable. Under 42 U.S.C. § 9607(a)(4)(B), the four classes of persons subject to CERCLA liability "shall be liable for … any other necessary costs of response incurred by any other person consistent with the national contingency plan."

As the court noted in *United States v. Hardage*, 982 F.2d 1436, 1445 (10th Cir. 1992), *cert. denied*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993), "[a] defense that the [plaintiff's] response costs are incurred pursuant to response actions that are inconsistent with the NCP is a defense to the recoverability of particular response costs, not a defense to liability for those costs." *See also Environmental Protection Agency v. TMG Enterprises, Inc.*, 979 F.Supp. 1110, 1121 (W.D.Ky.1997) (collecting cases holding likewise). The same is true of Defendant's claim that Plaintiff's response costs were not necessary. As this Court noted in *AT & T Global Information Solutions Co. v. Union Tank Car Co.*, 29 F.Supp.2d 857, 862 (S.D.Ohio 1998),

> While it is true that proof [that response costs were necessary and consistent with the national contingency plan] is required to prevail on a CERCLA claim, any failure by plaintiffs to show the "necessity" of response costs at this stage is not fatal. When, through partial summary judgment, a plaintiff seeks a declaration of the defendant's liability, the plaintiff is not required to prove that the response costs are necessary and

consistent with the national contingency plan; issues of proof related to the necessity and consistency of response costs are properly addressed in the contribution or damages phase of trial.

■ All that is needed at this stage of the litigation is for Plaintiff to show that it incurred at least one recoverable cost in response to the release of hazardous substances. *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1153 (9th Cir.1989). Plaintiff has done this. Investigatory costs, such as the cost of the Phase II site assessment, fall within the definition of "response costs." *Northwestern Mutual Life Ins. Co. v. Atlantic Research Corp.*, 847 F.Supp. 389, 396 (E.D.Va.1994); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir.1985); *United States v. Bogas*, 920 F.2d 363, 369 (6th Cir.1990). Investigatory costs are recoverable even if Plaintiff never incurs actual clean-up costs, *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.1986), *Johnson v. James Langley Operating Co., Inc.*, 226 F.3d 957, 963 (8th Cir.2000), and even if those costs are not consistent with the NCP. *Donahey v. Bogle*, 987 F.2d 1250, 1255–56 (6th Cir.1993), *cert. granted and judgment vacated on other grounds*, 512 U.S. 1201, 114 S.Ct. 2668, 129 L.Ed.2d 805 (1994).[12] Although both parties again devote much time and effort discussing whether other specific costs allegedly incurred by Plaintiffs to date are necessary and consistent with the NCP, the Court need not determine at this time whether these specific costs are recoverable. Since "necessity" is not an element of a prima facie case of CERCLA liability, Plaintiff's alleged failure to prove that each of its response costs are "necessary" does not entitle Defendant to summary judgment.[13]

---

**12.** However, any costs incurred after clean-up efforts have commenced are recoverable only if they are necessary and consistent with the NCP.

**13.** Defendant also argues that because Plaintiff's future costs are so speculative, Plaintiff is not entitled to declaratory relief. Even though the Court finds that factual issues preclude summary judgment at this time, the uncertainty of future costs would not bar declaratory relief. The Sixth Circuit has held that, despite the speculative nature of future response costs, declaratory judgment is appropriate. *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 844 (6th Cir.1994) ("[i]n providing for the recovery of response costs,

## 2. ARAR's

■ In its motion for summary judgment, Defendant devotes much time and effort to arguing that the Ohio EPA's Voluntary Action Program Soil Clean-up Standards are "applicable or relevant and appropriate requirements" ("ARARs"), and are the appropriate measuring stick by which the alleged contamination should be measured. These Soil Clean-up Standards set forth the maximum acceptable concentrations of certain metals for both industrial and residential sites; the standards are more stringent for residential areas.[14] According to Defendant, even under the more stringent standards established for residential sites, there is still no need for any remedial action.[15] Whether industrial or residential standards are used, Defendant contends that all metal concentrations fall within acceptable levels, except for one arsenic sample that is slightly above the residential limit. Defendant contends that this one sample is no cause for alarm because arsenic occurs naturally in the soil of Franklin County at levels above the maximum level set by the Ohio EPA. (Kasper Aff. ¶¶ 21–26).

ARARs determine the extent of clean-up required for a contaminated site. CERCLA remedies must meet either federal standards or more stringent state standards that qualify as ARARs. State standards may qualify as ARARs if they are properly promulgated, more stringent than federal standards, legally applicable or relevant and appropriate, and timely identified. 42 U.S.C. § 9621(d); *United States v. Akzo Coatings of Am., Inc.,* 949 F.2d 1409, 1440 (6th Cir.1991). Plaintiff claims that the Ohio Voluntary Action Program Soil Clean-up Standards are not ARARs because they are site-specific, not generally applicable, and not legally enforceable. For purposes of the pending motions, the Court need not decide whether the Ohio Voluntary Action Program Soil Clean-up Standards are ARARs because ARARs are not the standard by which CERCLA liability is determined.

■ In *Mid Valley Bank v. North Valley Bank,* 764 F.Supp. 1377 (E.D.Cal.1991), as in this case, the defendants claimed that since the levels of metal in the soil samples were below the state's relevant action levels, no "response" was required. The court rejected defendants' argument, noting that the term "hazardous substance" as used in CERCLA is defined by federal, not state, standards. *Id.* at 1386. Under CERCLA, the presence of any detectable amount of a hazardous substance, without regard to concentration, is sufficient to constitute a "release," triggering liability. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669 (5th Cir.1989); *United States v. Alcan Aluminum Corp.,* 755 F.Supp. 531, 537–38 (N.D.N.Y.1991); *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 517 (2d Cir.1996) (statute imposes no quantitative requirement).[16] Even if the levels of the hazardous substances are below background levels, this will not defeat liability as long as a "disposal" has occurred. *United States v.*

Congress included language to ensure that a responsible party's liability, once established, would not have to be relitigated ... the fact that future costs are somewhat speculative is no bar to a present declaration of liability").

**14.** For some of the metals found on Plaintiff's property, there are no applicable Voluntary Action Program Soil Clean-up Standards.

**15.** Defendant claims that Plaintiff is attempting to "upgrade" this site from an industrial one to a residential one at Defendant's expense. The Court finds that since the site is currently zoned "industrial," Defendant may not be held liable for clean-up costs in excess of what is required to remediate the site so that levels of contaminants do not exceed what has been established as an acceptable level for an industrial site.

**16.** Defendant correctly notes that no response action is warranted for "a naturally occurring substance in its unaltered form." However, this exception also requires that the substance be in a "location where it is naturally found." 42 U.S.C. § 9604(a)(3)(A). Since the metal concentrations in this case are located in "fill material" that was brought onto the property from somewhere else, this exception cannot apply.

*Western Processing Co., Inc.,* 734 F.Supp. 930, 936 (W.D.Wash.1990); *United States v. Rohm & Haas Co.,* 939 F.Supp. 1142, 1149 (D.N.J.1996) ("that these substances may have been detected at or below background levels or ARARs is not relevant for CERCLA § 107(a) liability").

In short, because CERCLA requires no quantitative requirement, the fact that the levels of concentrations of metals on the property in question may fall below standards promulgated by the Ohio EPA is completely irrelevant to the issue of Defendant's potential liability. Defendant is not entitled to summary judgment simply because the levels fall below certain state standards.

## IV. Conclusion

The Court finds that genuine issues of material fact preclude summary judgment on the issue of Defendant's liability. Plaintiff's motion for summary judgment (Record at 39) is therefore **DENIED.** Furthermore, the arguments advanced by Defendant in its motion for summary judgment are premature and have no bearing on Defendant's liability under CERCLA. Therefore, Defendant's motion for summary judgment (Record at 43) is also **DENIED.** However, the Court does find that, since Plaintiff has failed to establish that it is entitled to the "innocent landowner" defense, Plaintiff is limited to an action for contribution under 42 U.S.C. § 9613(f).

**IT IS SO ORDERED.**