**UNITED STATES of America,**
**Plaintiff,**

v.

**DOMENIC LOMBARDI REALTY,**
**INC., Defendant.**

**C.A. No. 98–591L.**

United States District Court,
D. Rhode Island.

June 7, 2002.

---

Michael P. Iannotti, U.S. Attorney's Office, Providence, RI, Norman O. Hemming, U.S. Dept. of Justice, Environmental Natural Resource Division, Washington, DC, for Plaintiff.

Perry D. Wheeler, Cranston, RI, Richard E. Gardiner, Fairfax, VA, for Defendant.

*Decision and Order*

LAGUEUX, Senior District Judge.

This matter is before the Court on the objection of defendant Domenic Lombardi Realty, Inc. to a Report and Recommendation issued by United States Magistrate Judge David Martin. The Report and Recommendation concludes that this Court should grant plaintiff United States Environmental Protection Agency's ("EPA") Motion for Summary Judgment on the issue of defendant's liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), which is contained in 42 U.S.C. § 9607. There are three underlying issues presented in this matter: (1) whether CERCLA is a constitutional congressional enactment under the Commerce Clause; (2) whether the presence of PCB-contaminated soil on the property involved constitutes a "release" or "threatened release" as defined in CERCLA; and (3) whether defendant may properly avail itself of the protection afforded by the innocent landowner defense, which is contained in CERCLA's third party defense. For the reasons set

forth below, this Court adopts the Report and Recommendation insofar as it concludes that CERCLA is a constitutional enactment under the Commerce Clause. This Court further adopts the Report and Recommendation insofar as it concludes that the presence of PCB-contaminated soil on the property constitutes a "release" as defined by CERCLA. The Court, however, declines to adopt the Report and Recommendation's suggestion to grant EPA's Motion for Summary Judgment because there are disputed issues of material fact regarding whether the innocent landowner defense affords defendant protection from CERCLA liability.

## I. BACKGROUND

Defendant is a residential and commercial property management company incorporated under the laws of Rhode Island, with a principal place of business in West Warwick, Rhode Island.

In 1986, defendant purchased from Armand Allen ("Allen") 31 acres of residential property located in West Greenwich, Rhode Island ("the Site"). A house is located on the Site, and the Site is surrounded by other residential properties. Shortly after defendant purchased the property, however, it became the focus of investigations conducted by both the Rhode Island Department of Environmental Management ("RIDEM") and EPA.

*RIDEM and EPA Investigations of the Site*

*The Years 1987–1988*

On November 9, 1987, and May 27, 1988, RIDEM sent Notices of Violation and Order to defendant. These Notices charged defendant with, *inter alia,* disposing of solid waste without a license and ordered defendant to perform certain cleanup activities.

RIDEM officials also inspected the Site on a number of different occasions. On May 12, 1988, RIDEM officials inspected the Site at which time they observed an area on the property that was visibly stained with oil. RIDEM officials took samples of the soil, which were sent to a laboratory for analysis. On December 17, 1988, RIDEM officials conducted another inspection of the Site, during which time they took another sample of the soil. This sample was also sent to the laboratory for analysis. The laboratory's test results indicated that the soil samples taken from the Site on May 12, 1988, and December 17, 1988, contained hazardous levels of Polychlorinated Biphenyls ("PCBs") as defined by the State of Rhode Island Rules and Regulations for Hazardous Waste Generation, Transportation, Treatment, Storage and Disposal.

On August 17, 1988, in between the time of the May 1988 and December 1988 inspections, RIDEM received a letter from Domenic J. Lombardi, Jr. ("Lombardi"), the President of the defendant corporation, regarding the May 1988 Notice of Violation and Order. In his letter, Lombardi stated that he had never dumped hazardous material on the Site and suggested that the previous owner, Allen, had dumped the waste materials and, therefore, RIDEM should contact Allen about this problem.

*The Year 1989*

On February 17, 1989, RIDEM officials sent a third Notice of Violation and Order to defendant. Similar to the past two Notices, the February 1989 Notice ordered defendant to conduct cleanup activities to remove the PCB-contaminated soil from the Site.

Shortly after receiving the February 1989 Notice, defendant initiated cleanup activities at the Site. On August 22, 1989, RIDEM officials met with an engineer re-

tained by defendant at the property to point out the location of the soil that contained PCBs. Defendant subsequently hired a contractor to excavate the contaminated soil.

On October 12, 1989, under RIDEM supervision, defendant's contractor, Robert Boyer, excavated the PCB-contaminated soil and consolidated it into two piles, which were placed on polyplastic and covered with the same. A few months after the excavation was completed, Lombardi informed RIDEM that defendant had hired James Smith ("Smith") to remove the contaminated soil. RIDEM, however, informed Lombardi that Smith was not a licensed hazardous waste transporter and, consequently, was ineligible to perform the job.

After receiving notice of Smith's inability to perform the removal, defendant failed to hire a licensed hazardous waste transporter and, the contaminated soil remained on the Site.

*The Years 1990–1995*

On July 17, 1990, almost two years after their last inspection, RIDEM officials conducted another inspection of the Site. During the July 1990 inspection, RIDEM officials observed that the "PCB contaminated soil pile appeared to be untouched; however, the polyplastic covering the material [had] blown off leaving the pile uncovered." That same day, RIDEM sent a letter to defendant's counsel advising him of defendant's noncompliance with the February 1989 Notice of Violation and Order.

Shortly thereafter, RIDEM conducted follow-up inspections of the Site on July 23, 1991, and September 17, 1991; but, the condition of the soil remained the same: "[T]he piles of PCB-contaminated soil remained uncovered." Consequently, on July 11, 1994, RIDEM requested assistance from EPA to address the issue of the PCB-contaminated soil.

On November 21, 1994, after conducting its own inspection of the Site, EPA sent a letter to defendant notifying defendant of its potential liability under CERCLA and requesting defendant to perform or finance cleanup activities at the Site. However, by a letter to EPA dated December 2, 1994, Lombardi declined to have defendant perform or finance the removal of the PCB-contaminated soil. In his letter he stated that since defendant had not placed the material on the property, he believed that defendant had no duty to remove the contaminated soil.

As a result of defendant's refusal to finance the cleanup of the Site, EPA hired a contractor, O.H. Materials, Inc. ("OHM"), to remove the contaminated soil from defendant's property. From February 1995 to April 1995, OHM excavated approximately nine hundred tons of PCB-contaminated soil, which included the seventy tons of soil previously excavated and placed in two piles on polyplastic, and disposed of the soil at an off-site landfill that was licensed to accept PCBs for disposal. To date, EPA claims it has incurred $346,129.92 in costs related to the Removal Action in addition to $17,703.14 in interest on those costs.

*Domenic Lombardi's Knowledge Regarding the Previous Owner of the Site*

In a letter dated July 30, 1998, to EPA attorney, Audrey Zucker, Lombardi stated that prior to purchasing the West Greenwich property, he was aware that the previous owner of the property, Allen, had been operating a junkyard on the premises. According to Lombardi, Allen had separated metals on the Site and sold them to a scrap yard. Lombardi also noted that the State and Local police had given Allen "a problem" because of his activities in connection with the junkyard.

In the July 1998 letter, Lombardi also stated that his investigation of Allen's activities on the Site revealed that Allen had received "contaminated transformers" from Narragansett Electric Company, which Allen "displace[d] into the ground." Lombardi explained that had he known before defendant purchased the property that the Site had "environmental problems," he never would have purchased it on behalf of defendant.

He blamed his lack of knowledge regarding the Site's hazardous waste problem on his real estate agent, Ray Walsh ("Walsh"). In his July 1998 letter, Lombardi stated that he was puzzled as to why Walsh did not inspect the Site prior to defendant's agreement to purchase it.[1] He also stated that the sale of the property occurred in "record time": The purchase and sale of the property took only seventeen days to complete. In his letter to EPA, Lombardi agreed to pay $50,000 to $60,000 [2] towards EPA's removal costs but asked that the "guilty culprit," Allen, be held liable for the balance of the costs.

*EPA's Lawsuit*

On December 10, 1998, EPA initiated this action against defendant, seeking recovery of the costs of the Removal Action under 42 U.S.C. § 9607(a), commonly known as CERCLA.[3] On March 29, 1999, Domenic Lombardi, in his capacity as President of Domenic Lombardi Realty Inc., attempted to answer the Complaint on behalf of the corporation by filing a Motion to Dismiss and Motion for Leave to File a Cross–Complaint. United States Magistrate Judge Robert W. Lovegreen, however, denied Lombardi permission to represent the defendant realty company.[4] On April 30, 1999, however, this writer, in the interest of justice, granted Lombardi time to refile certain documents as pleadings. On the same day, EPA filed a Consolidated Motion to Strike Defendant's Motion to Dismiss and a Motion for Summary Judgment ("Consolidated Motions"), which were referred to Magistrate Judge Martin.[5]

On October 29, 1999, a hearing was held before Magistrate Judge Martin on EPA's Consolidated Motions. At this hearing, Magistrate Judge Martin ordered Lombardi to obtain counsel for the defendant corporation because the corporation could not be represented by someone acting pro se. Shortly thereafter, Lombardi retained Attorneys Perry D. Wheeler and Richard E. Gardiner to represent the defendant corporation.[6]

---

1. Walsh had conducted an inspection of another piece of property Lombardi purchased in Scituate, Rhode Island, and that inspection revealed an "environmental problem that had to be taken care of before the property could be sold" to Lombardi.

2. Based on estimates he received regarding the removal of the PCB-contaminated soil, Lombardi believed that the removal action should cost between $50,000 and $60,000.

3. 42 U.S.C. § 9607(a) provides in pertinent part that: "(1) the owner and operator of a vessel or a facility, ... from which there is a release or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for (A) all costs

of removal or remedial action incurred by the United States Government...."

4. Lombardi unsuccessfully petitioned the First Circuit Court of Appeals for a writ of mandamus granting him permission to represent the defendant corporation, which a panel of the First Circuit denied on May 4, 1999. The First Circuit stated that challenges to the ruling of a magistrate judge must be presented in the first instance to the district judge.

5. On April 30, 1999, Magistrate Judge Lovegreen recused himself from this case and, this writer referred the matter to Magistrate Judge Martin.

6. On January 5, 2000, this writer granted a motion for Attorney Gardiner to appear pro hac vice.

On February 17, 2000, Magistrate Judge Martin heard oral argument on EPA's Consolidated Motions and took the matter under advisement;[7] and, on January 25, 2001, Magistrate Judge Martin issued a detailed Report and Recommendation concluding that this Court should grant EPA's Motion for Summary Judgment.

The Report and Recommendation addressed five issues regarding defendant's liability under CERCLA. First, Magistrate Judge Martin concluded that CERCLA is a constitutional enactment under the Commerce Clause. Second, he found that defendant's argument that EPA violated its Fourth Amendment rights by entering the Site without a warrant was moot because defendant conceded that EPA was granted permission to enter the Site. Third, Magistrate Judge Martin concluded that EPA's CERCLA claim was not time-barred because defendant had executed an agreement tolling the statute of limitations. Fourth, he found that EPA had successfully proven its prima facie CERCLA cost recovery case against defendant. Lastly, the Magistrate Judge concluded that defendant failed to establish that it was eligible to avail itself of the protection of either the third party defense or the innocent landowner exception as set forth in CERCLA.

Defendant subsequently filed a timely objection to the Report and Recommendation. In its objection to the Report and Recommendation, defendant makes three arguments: (1) that CERCLA is not a constitutional congressional enactment under the Commerce Clause; (2) that the presence of PCB-contaminated soil on the Site does not constitute a "release" or "threatened release" of hazardous waste and, therefore, EPA has failed to prove its CERCLA claim against defendant; and (3) that defendant is afforded protection from liability because it is entitled to utilize the innocent landowner defense.

On May 29, 2001, this Court heard oral argument on defendant's objections and took the matter under advisement. After reviewing both the Report and Recommendation and the record in this case, this Court concludes (1) that CERCLA is a constitutional exercise of Congress's Commerce Clause power; (2) that defendant's Fourth Amendment claim is moot; and (3) that EPA has clearly established defendant's liability under 42 U.S.C. § 9607(a). This Court, however, declines to adopt the Report and Recommendation insofar as it recommends that the Court grant EPA's Motion for Summary Judgment. There are disputed issues of material fact regarding the availability of the innocent landowner defense to defendant which should be resolved at trial. Accordingly, because the Court does not adopt the Report and Recommendation in its entirety, the Court will now address each of the points of contention.

## II. STANDARD OF REVIEW

A motion for summary judgment is listed as one of the motions on which a magistrate judge may not make a final determination. *See* 28 U.S.C. § 636(b). Therefore, this Court utilizes de novo review of the Magistrate Judge's Report and Recommendation. *See id.*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

7. Lombardi filed, on behalf of the defendant corporation, a Motion for Summary Judgment on June 6, 1999, and two Motions for Default Judgment against the United States on July 30, 1999, and October 13, 1999, respectively. On February 23, 2000, however, Magistrate Judge Martin issued an order mooting all of the motions Lombardi filed while representing the defendant pro se.

The judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners,* 53 F.3d 454, 460 (1st Cir.1995). Similarly, "summary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I.1991). The moving party, furthermore, bears the burden of showing that no evidence supports the nonmoving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, summary judgment is appropriate only where there is no dispute as to any material fact and only questions of law remain. *See Gannon,* 777 F.Supp. at 169.

## III. DISCUSSION

### A. The Constitutionality of CERCLA under the Commerce Clause

#### 1. Basic Principles

■ The Commerce Clause provides in relevant part that "Congress shall have the power ... to regulate Commerce ... among the several states." U.S. Const. art. I, § 8, cls. 1, 3. Federal courts have interpreted Congress's power under the Commerce Clause broadly, thereby granting Congress substantial deference in the exercise of its federal powers. *See Gibbs v. Babbitt,* 214 F.3d 483, 490 (4th Cir.2000). Recent Supreme Court jurisprudence, however, has emphasized that "even under our modern, expansive interpretation of the Commerce Clause, Congress's regulatory authority is not without effective bounds." *United States v. Morrison,* 529 U.S. 598, 608, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Although the Commerce Clause bestows on Congress significant authority to regulate certain activities, principles of federalism prevent Congress from obliterating the line between what is national and what is local. *Id.* (citing *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937)). Consequently, the determination of whether a particular activity affects interstate commerce sufficiently to come within the constitutional grant of power to Congress must ultimately be made by the judiciary. *Morrison,* 529 U.S. at 614, 120 S.Ct. 1740.

■ To aid courts in making this determination, the Supreme Court, in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), established three broad categories where Congress may exercise its Commerce Clause power. Congress may regulate (1) the channels of

interstate commerce; (2) the instrumentalities of commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *Id.* at 558–559, 115 S.Ct. 1624. Utilizing this framework, courts are instructed to make an independent evaluation to determine "whether Congress could rationally conclude that the regulated activity affects interstate commerce." *Gibbs,* 214 F.3d at 490 (citing *Lopez,* 514 U.S. at 557, 115 S.Ct. 1624).

2. The Significance of *United States v. Lopez* and its progeny

Prior to the Supreme Court decisions in *Lopez* and *Morrison,* the standards to be utilized in determining whether a regulated activity affected interstate commerce were unclear. In 1995 in *Lopez,* and again in 2000 in *Morrison,* the Supreme Court sought to clarify the muddied waters of its prior Commerce Clause jurisprudence. These two decisions highlight four key considerations courts should take into account when deciding whether Congress has exceeded its power under the Commerce Clause.

■ First, the *Lopez* Court held, and the *Morrison* Court affirmed, that under the "substantially affects" prong of the *Lopez* test, Congress, pursuant to its Commerce Clause power, may regulate intrastate *economic* activities that substantially affect interstate commerce. *Lopez,* 514 U.S. at 559, 115 S.Ct. 1624; *Morrison,* 529 U.S. at 610, 120 S.Ct. 1740. Second, the Court explained that a jurisdictional element limits the range of activities Congress may regulate under the Commerce Clause to those that have a connection with or a direct effect on interstate commerce in order to establish that the enactment is in pursuance of Congress's regulation of interstate commerce. *See Morrison,* 529 U.S. at 611–12, 120

S.Ct. 1740. Third, both the *Lopez* and *Morrison* decisions explained the significance of congressional findings: "While 'Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce,' the existence of such findings may 'enable [courts] to evaluate the legislative judgment that the activity in question substantially affects interstate commerce, even though no such substantial effect is visible to the naked eye.'" *Morrison,* 529 U.S. at 612, 120 S.Ct. 1740 (citations omitted). Lastly, the Supreme Court emphasized that congressional enactments that have tenuous connections to interstate commerce will not withstand judicial scrutiny. *See Gibbs,* 214 F.3d at 491 (noting that *Lopez* and *Morrison* rested on the principle that "where a federal statute has only a tenuous connection to commerce ... the courts should not hesitate to exercise their constitutional obligation to hold that the statute exceeds an enumerated federal power"). These considerations provide the support for this Court's conclusion that CERCLA is a legitimate congressional enactment under the Commerce Clause because it regulates an activity—the disposal of hazardous waste—that substantially affects interstate commerce.

3. The Disposal of Hazardous Waste Substantially Affects Interstate Commerce

In this case, the Magistrate Judge analyzed the constitutionality of CERCLA under the third prong of the *Lopez* test and determined that CERCLA regulates an activity—the disposal of hazardous waste—that substantially affects interstate commerce. In its objection to the Report and Recommendation, however, defendant contends that the Magistrate Judge did not consider "whether the disposal of hazardous waste or presence of hazardous

waste on private property has a substantial affect [sic] on interstate commerce." Def.'s Obj. Magis. J.'s Rep. & Recomm., at 9–10. Defendant argues that the disposal or presence of hazardous waste on the Site does not have a substantial effect on interstate commerce and, therefore, CERCLA is unconstitutional as applied in this case. This Court, however, finds defendant's argument devoid of merit.

Admittedly, CERCLA contains neither legislative findings nor a jurisdictional statement which would aid the Court in ascertaining a connection to interstate commerce. Certainly CERCLA's connection to interstate commerce is not patently visible to the naked eye. Nevertheless, this Court concludes that local, on-site disposal of hazardous waste substantially affects interstate commerce.

As noted previously, " '[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.' " *Morrison*, 529 U.S. at 610, 120 S.Ct. 1740 (citation omitted). The determination of whether an economic activity substantially affects interstate commerce, however, requires a court to construe what is deemed "economic activity" broadly. *See Gibbs*, 214 F.3d at 491 (noting that "a cramped view of commerce would cripple a foremost federal power and in so doing would eviscerate national authority"). Indeed, *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), a case which represents both the outer limits of Congress's Commerce Clause power and congressional regulation of an economic activity, demonstrates the broad latitude with which the Supreme Court defines the scope of this concept.

Upholding CERCLA as a constitutional enactment under Congress's Commerce Clause power, however, does not require this Court to reach as far as the *Wickard* decision. The disposal of hazardous waste on private property, similar to the homegrown wheat in *Wickard*, is an intrastate economic activity that substantially affects interstate commerce. This Court finds the reasoning of the Eleventh Circuit in *United States v. Olin*, 107 F.3d 1506 (11th Cir.1997) instructive on this point.

a. CERCLA's Legislative History

In *Olin*, the Eleventh Circuit addressed the issue that is before this Court: Whether on-site disposal of hazardous waste substantially affects interstate commerce. In its decision, the *Olin* Court explained that it found persuasive the findings the Committee on Environment and Public Works ("the Committee") made concerning a bill that contained provisions that were later incorporated into CERCLA. After examining CERCLA's legislative history, the *Olin* Court concluded that Congress had a rational basis for concluding that on-site disposal of hazardous waste substantially affects interstate commerce.

According to the Eleventh Circuit, CERCLA'S legislative history details the exorbitant amount of money that it costs the government to handle and dispose of hazardous waste. *Olin*, 107 F.3d at 1511 (citing S.Rep. No. 96–848, 96th Cong., 2d Sess. 2 (1980), *reprinted in* 1 Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, at 309 (1983)). In support of this contention, the *Olin* Court refers to a 1980 report from the Office of Technological Assessment, which gauged the "agricultural losses from chemical contamination in six states at $283 million." *Id.* Additionally, the Eleventh Circuit found compelling the Committee's report regarding the extent of commercial damage caused by intrastate, on-site disposal of hazardous waste. *Id.*

CERCLA's legislative history, the *Olin* Court concludes, demonstrates that on-site disposal of hazardous waste substantially affects interstate commerce. The Eleventh Circuit reached this conclusion not only by examining CERCLA's legislative history but also by considering the consequences of unregulated disposal of hazardous waste: "[T]o the extent a [company] can dispose of its waste on-site free of regulation, it would have a market advantage over [ ]companies that lack on-site options." *Id.* at 1511. This Court finds the reasoning set forth by the Eleventh Circuit persuasive.

Congress enacted CERCLA as a comprehensive regulatory response to the growing problem of hazardous waste and "to provide 'an array of mechanisms to combat the increasingly serious problems of hazardous substance release.'" *United States v. Hardage,* 761 F.Supp. 1501, 1508 (W.D.Okla.1990) (citation omitted). The Committee Report examined by the Eleventh Circuit not only details the growth of the chemical industry but also thoroughly describes the mounting problem associated with improperly maintained waste sites. Frank P. Grad, Treatise on Environmental Law § 4A.02[2][d] (Vol. 3 2001) (citing S.Rep. No. 96–848, at 6 (1980)). To buttress these contentions, the Committee relied on EPA reports that chronicled thousands of incidents involving hazardous waste. *Id.* (citing S.Rep. No. 96–848, at 7 (1980)).

Thus, as one court has noted, CERCLA's legislative history demonstrates that if left unregulated, on-site disposal of hazardous waste would unquestionably affect surface and groundwater, which in turn, would substantially affect the fishing and agriculture industries, as well as livestock production, recreation, and domestic and industrial water supplies. *See Nova Chems., Inc. v. GAF Corp.,* 945 F.Supp.

1098, 1103 (E.D.Tenn.1996)(quoting *United States v. NL Indus.,* 936 F.Supp. 545, 563 (S.D.Ill.1996)); *see also Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 282, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (stating that "[t]he Commerce Clause [is] broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that *may* have effects in more than one State" (emphasis added)). Therefore, Congress's effort through CERCLA to preserve and protect not only our natural resources but also the industries which thrive on those resources clearly has a direct nexus to interstate commerce. *See Nova Chems.,* 945 F.Supp. at 1106.

■ It is important to further note that under the Commerce Clause, Congress has the power to create general regulatory schemes, like CERCLA, that bear a substantial relation to interstate commerce. *Olin,* 107 F.3d at 1509. Contrary to defendant's contentions, the *de minimis* character of individual instances arising under the statute is of no consequence. *Id.* at 1510 (citing *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)). Indeed, according to Commerce Clause jurisprudence, the constitutionality of these statutes does not depend on the individual circumstances that arise by application of the statute. Rather, the critical inquiry is whether the regulatory scheme as a whole has a substantial affect on interstate commerce. *See Gibbs,* 214 F.3d at 497–98. Thus, in this case, it is irrelevant that the PCB-contaminated soil has not *yet* resulted in environmental damage that extends beyond either the four corners of the Site or the State of Rhode Island. *See id.* at 500 ("Courts have consistently upheld Congress's authority to regulate private activities in order to ... protect the environment."); *see also Proy-*

*ect v. United States,* 101 F.3d 11, 13 (2d Cir.1996). It is sufficient that CERCLA targets the disposal of hazardous waste, which, as demonstrated by CERCLA's legislative history, has a substantial affect on interstate commerce.

Indeed, to adopt defendant's theory of Congress's Commerce Clause power would render Congress's federal power impotent: In this case, Congress would be precluded from taking prophylactic measures to protect the environment from environmental damage caused by on-site disposal of hazardous waste. It is the consideration of the consequences of unregulated on-site disposal of hazardous waste and CERCLA's legislative history that leads this Court to conclude that Congress had a rational basis for concluding that the disposal of hazardous waste, intrastate or otherwise, has a substantial affect on interstate commerce.

To conclude, Congress's regulation of on-site disposal of hazardous waste is a constitutionally permissible enactment under the Commerce Clause. CERCLA, furthermore, is "reasonably adapted to the ends of cleaning up existing environmental degradation, preventing improper disposal of hazardous waste in the future, and recovering the cost of response and remedial actions." *NL Indust.,* 936 F.Supp. at 562 n. 21 Congress need not wait until the effects of intrastate disposal of hazardous waste reach beyond the borders of this State, let alone the Site, to regulate it under the Commerce Clause.

In any event, the disposal of PCBs into the soil at the Site in this case is clearly an economic activity that substantially affects interstate commerce. It is undisputed that the PCB-contaminated soil originated from the entrepreneurial activities of Allen, the previous owner of the Site, who, according to Lombardi, was separating metals on the Site to sell to scrap yards.

It is also undisputed that EPA paid to remediate the environmental damage caused by Allen. Thus, it is clear to this Court that, in this case, the PCB-contaminated soil, which originated from Allen's junkyard business, and EPA's remediation of defendant's Site are clearly economic activities that substantially affect interstate commerce. *See Nova,* 945 F.Supp. at 1106 ("The release of hazardous waste and the remediation of hazardous waste sites are clearly economic activities.").

B. The Presence of Contaminated Soil on Property Constitutes a "Release" within the Meaning of CERCLA

 In order for EPA to pursue successfully its CERCLA claim against defendant, it must prove (1) a release or threatened release of hazardous waste has occurred, (2) at a facility, (3) causing EPA to incur response costs, and (4) the defendant is a responsible party as defined by 42 U.S.C. § 9607(a). *See* 42 U.S.C. § 9607(a)(1–4); *see also United States v. DiBiase Salem Realty Trust,* Civ. A. No. 91–11028–MA, 1993 WL 729662, at *5 (D.Mass. Nov.19, 1993). In this case, it is undisputed that EPA has successfully proven that the Site is a facility under CERCLA; that it incurred response costs; and that defendant is a responsible party. The only issue that is contested is whether the presence of the PCB-contaminated soil at the Site constitutes a "release" as defined in CERCLA.

CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contamination)." 42 U.S.C. § 9601(22). Courts have interpreted this definition

broadly "and have consistently rejected attempts to limit CERCLA's reach ... through restrictive interpretations of the term 'release.'" *Lincoln Props., Ltd. v. Higgins,* 823 F.Supp. 1528, 1536 (E.D.Cal. 1992); *see also Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1152 (1st Cir.1989); *Canadyne–Georgia Corp. v. Bank of America, N.A.,* 174 F.Supp.2d 1337, 1346 (M.D.Ga.2001) ("[T]he term 'release' should be construed broadly in order to fulfill the goals of CERCLA."); *Amland Props. Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 793 (D.N.J.1989).

In its objection to the Report and Recommendation, however, defendant attempts to persuade this Court to adopt a more restrictive interpretation of the term "release." Specifically, defendant argues that in using the phrase "from which there *is* a release," the plain language of the statute makes clear that the release cannot have already occurred. Rather, according to defendant, it must be current and ongoing because the definition of "release" is in the present tense. This Court, however, refuses to apply such a restrictive interpretation of the term "release" in this case.

By its terms, CERCLA is a strict liability statute with limited and narrow defenses. Its primary purpose is to encourage voluntary cleanup and, to achieve this goal, the statute envisions circumstances in which the "cleanup must be paid for by those least responsible because those who are most responsible lack funds or cannot be found." *Lincoln Props.,* 823 F.Supp. at 1537. Defendant's interpretation of "release," attempts to circumvent this reality by creating a new defense, which would permit individuals to avoid liability by arguing that *past* releases or disposals of hazardous waste do not fall within the definition of "release." As aforementioned, courts have refused to expand CERCLA's limited defenses through restrictive interpretations of the term "release." *Id.* at 1536; *see also United States v. 150 Acres of Land,* 204 F.3d 698, 705–06 (6th Cir.2000).

In this case, defendant does not dispute that the Site contained PCB-contaminated soil, which defendant, upon RIDEM's recommendation, paid to have excavated and placed on polyplastic. A number of courts have held that the presence of hazardous material at a site is sufficient to constitute a "release" for purposes of triggering CERCLA liability. *See, e.g., Containerport Grp., Inc. v. American Fin. Grp.,* 128 F.Supp.2d 470, 482 (S.D.Ohio 2001); *American Nat'l Bank & Trust Co. v. Harcros Chems., Inc.,* 997 F.Supp. 994, 998 (N.D.Ill.1998) ("[T]he record shows that the presence of hazardous substances at the sites at issue supports a conclusion that releases have occurred...."); *Foster v. United States,* 922 F.Supp. 642, 651 (D.D.C.1996) (noting that the presence of hazardous substances in the soil and groundwater constitutes a "release"); *Di-Biase,* 1993 WL 729662, at *4 ("To trigger liability, CERCLA requires only the presence at a facility of *any* of CERCLA's listed hazardous substances."); *Hardage,* 761 F.Supp. at 1510 ("The presence of hazardous substances in the soil, surface, water or groundwater of a site demonstrates a release."). The Sixth Circuit explained that the presence of hazardous waste is sufficient to constitute a "release" because a "'release' stand[s] for the *actual* entry of substances into the environment". *150 Acres of Land,* 204 F.3d at 706 (emphasis added). CERCLA defines the "environment" as "any other surface water, ground water, drinking water supply, *land surface* or subsurface strata, or ambient air within the United States...." 42 U.S.C. § 9601(8)(B) (emphasis added).

Here, the parties do not dispute that PCB is a hazardous substance and, it is also undisputed that PCBs entered the soil during the time Allen owned the property. Accordingly, this Court concludes that the presence of PCB-contaminated soil at the Site constitutes a "release."[8] The only common sense interpretation of this term is to include *past* releases of hazardous substances within the definition of "release." To hold otherwise would undermine CERCLA's goal of encouraging voluntary cleanup by those in a position to do so.

## C. CERCLA's Third Party Defense

CERCLA contains only three defenses to liability. *See* 42 U.S.C. § 9607(b). Section 9607(b) provides in relevant part:

> There shall be no liability ... for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—(1) an act of God; (2) an act of war; (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant....

42 U.S.C § 9607(b). It is the third defense, commonly known as the third party defense, which is the focus in this matter.

■ In this case, in order to invoke the third party defense thereby avoiding CERCLA liability, defendant must prove by a preponderance of the evidence (1) that a third party caused the release of hazardous substance; (2) that the third party was not defendant's employee or agent; (3) that the act or omission of the third party did not occur in connection with a contractual relationship existing either directly or indirectly with defendant; (4) that defendant exercised due care with respect to the PCB-contaminated soil; and (5) that defendant took precautions against foreseeable actions or omissions of third parties *See* 42 U.S.C. § 9607(b); *see also DiBiase*, 1993 WL 729662, at *6.

1. A Third Party's Acts or Omissions *in connection with* a Contractual Relationship

■ In the Report and Recommendation, the Magistrate Judge concluded that defendant did not meet the requirements of the third party defense because defendant had a contractual relationship as defined in 42 U.S.C § 9601(35)(A), *infra*, with the prior owner of the Site, Allen. The contractual relationship, according to the Magistrate Judge, was based on the defendant's 1986 contract to purchase the Site from Allen.

Defendant argues, however, that the language of the statute requires that the act or omission that caused the release of the hazardous substance must have occurred *in connection with* the contractual relationship. Defendant contends that it may avail itself of the protection afforded by the third party defense because the defendant's contract to purchase Allen's property was not connected, either directly or indirectly, with the release of PCBs into the soil.

In support of its argument, defendant contends that this Court should follow the Second Circuit's treatment of this issue in *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*, 964 F.2d 85 (2d Cir.1992). In *Westwood*, the

---

8. Because this Court concludes that the presence of hazardous waste on the Site constitutes a "release" and thus triggers CERCLA liability, the Court does not need to address the issue of whether defendant's excavation activities constitute a separate "release."

Second Circuit held that the "in connection with" language of the third party defense requires the contract to relate to the hazardous substances or allow the landowner to exert some element of control over the third party's activities. *Id.* at 91.

Having reviewed the relevant statutory language, however, this Court concludes that defendant's contract to purchase the Site from Allen precludes defendant from availing itself of the protection afforded by the third party defense. 42 U.S.C. § 9601(35)(A) defines "contractual relationship" for purposes of the third party defense contained in § 9607(b)(3). Section 9601(35)(A) states in relevant part that "[t]he term 'contractual relationship' ... includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession...." 42 U.S.C. § 9601(35)(A). The statutory definition of "contractual relationship," therefore, expressly includes contracts for the sale of land.

In order to give full effect to the statutory definition of "contractual relationship," this Court concludes that contracts for the sale of land preclude a defendant, such as Domenic Lombardi Realty, Inc., from availing itself of the protection afforded by the third party defense. To adopt the interpretation set forth by the Second Circuit in *Westwood* would render the explicit language of the statutory definition inoperative. *See Containerport,* 128 F.Supp.2d at 478 n. 8; *see also In re Hemingway*

*Transport, Inc.,* 993 F.2d 915, 932 (1st Cir.1993); *Grand Street Artists v. Gen. Elec. Co.,* 28 F.Supp.2d 291, 295–96 (D.N.J. 1998); *Lefebvre v. Central Maine Pwr. Co.,* 7 F.Supp.2d 64, 70 (D.Me.1998) (noting that a property chain of title can be considered a contractual relationship); *DiBiase,* 1993 WL 729662, at \*6; *Steego Corp. v. Ravenal,* 830 F.Supp. 42, 51–52 (D.Mass.1993).

**2. The Innocent Landowner Exception to the Third Party Defense**

Although the third party defense affords defendant no protection, defendant may, nevertheless, avoid CERCLA liability by utilizing the innocent landowner defense, a narrow exception carved out of the third party defense. 42 U.S.C. § 9601(35)(A) and (B), commonly known as the "innocent landowner defense," not only sets forth the definition of "contractual relationship," *supra,* but also details the circumstances under which an innocent purchaser of hazardous land may, nonetheless, escape liability.[9]

■ In this case, in order to avoid CERCLA liability utilizing the innocent landowner defense, defendant must prove by a preponderance of the evidence (1) that it acquired the Site after the initial release of PCBs into the soil; (2) that at the time of its acquisition, defendant did not know and had no reason to know that any hazardous waste was deposited at the Site; and (3) that once the presence of the

---

**9.** Contained in 42 U.S.C. § 9601(35)(A), the innocent landowner exception to the third party defense states in relevant part:

> The term "contractual relationship," for the purpose of section 9607(b)(3) [the third party defense] ... includes, but is not limited to, land contracts, deeds, or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the

> facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence: (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance ... was disposed of on, in, or at the facility.... In addition to establishing the foregoing, the defendant must establish that he has satisfied the requirements of [42 U.S.C.] section 9607(b)(3)(a) and (b).

PCB-contaminated soil became known, defendant exercised due care under the circumstances. *See* 42 U.S.C. § 9601(35)(A)(i-iii), (B); *see also Hemingway Transport*, 993 F.2d at 932.

Furthermore, in order to avail itself of the protective umbrella of the innocent landowner defense, defendant must also prove that it undertook all appropriate inquiry into Allen's ownership and uses of the Site in order to minimize liability. In making this determination, Congress has instructed courts to consider: (1) any specialized knowledge or experience on the part of the defendant; (2) the relationship of the purchase price to the value of the property if uncontaminated; (3) commonly known or reasonably ascertainable information about the property; (4) the obviousness of the presence or likely presence of contamination at the property; and (5) the ability to detect such contamination by appropriate inspection. *See* 42 U.S.C. § 9601(35)(B); *see also Hemingway Transport*, 993 F.2d at 932.

▋ The Magistrate Judge concluded in his Report and Recommendation that defendant did not meet the requirements of the innocent landowner defense for two reasons. First, the Magistrate Judge found that defendant had reason to know of the existence of the PCB-contaminated soil before it purchased the Site, and therefore, fails the lack of knowledge requirement of the innocent landowner defense. Second, he concludes that defendant did not exercise due care with regard to the contaminated soil because when the polyplastic cover blew off the contaminated soil piles, thereby exposing them to the elements, defendant did nothing to ameliorate the problem. For those two reasons, the Magistrate Judge recommended that this Court grant EPA's Motion for Summary Judgment on the issue of liability.

After reviewing the record in the light most favorable to the nonmoving party—here, defendant Domenic Lombardi Realty, Inc., this Court concludes that there are disputed material facts on the issue of whether defendant has met the requirements of the innocent landowner defense. *See Springfield Terminal Ry.*, 133 F.3d at 106. Specifically, there are genuine issues of fact regarding whether defendant had reason to know of the PCB-contaminated soil before it purchased the Site and whether defendant exercised due care once the PCB-contaminated soil was discovered. Accordingly, this Court must deny EPA's Motion for Summary Judgment.

a. The Knowledge Requirement of the Innocent Landowner Defense

The Report and Recommendation asserts that defendant had reason to know of the contaminated soil before it purchased the Site based on the following "facts": (1) that defendant knew Allen, the previous owner, operated an unlicensed junkyard on the Site and that Allen, as part of his junkyard business, separated "metals" on the property, including transformers from Narraganset Electric Company; (2) that Lombardi, before purchasing the Site, visited the property on a number of different occasions and therefore should have seen the oil stained soil at the Site; (3) that Lombardi knew the "authorities" were causing problems for Allen; (4) that defendant is a commercial real estate developer and therefore should have conducted an inspection of the Site before acquiring it; and (5) that defendant should have been suspicious when Allen substantially dropped the "asking" price.

In its objection to the Report and Recommendation, however, defendant draws this Court's attention to a number of issues, which, upon this Court's examination of the record, indicate genuine issues of fact. First, although Lombardi was aware that Allen was operating an unlicensed junkyard on the premises, there is nothing in the current record to suggest that Lom-

bardi had reason to know that hazardous waste was on the property at the time his company acquired it. Second, the Report and Recommendation suggests that prior to purchasing the property, defendant could have ascertained the existence of environmental problems at the Site by contacting State, Local, or environmental authorities. The record, however, indicates that it was not until RIDEM officials took samples of the soil in May 1988, more than a year after defendant purchased the Site, that defendant became aware of the PCB-contaminated soil. Thus, the Magistrate Judge's conclusion that "surely defendant could have ascertained from the local or state police or environmental officials the nature of the problems at the Site" is clearly unsupported. Third, defendant contends that, contrary to the Magistrate Judge's finding, Lombardi made very few visits to the property before purchasing it and, thus, did not have opportunity to observe the oil stained soil, which was located approximately 250 feet from the back of the house. This Court further notes that it is unclear whether the oil stained soil was present during the times Lombardi visited the property. Fourth, this Court cannot conclude as a matter of law that defendant should have been aware of the PCB-contaminated soil based on the substantial decrease in Allen's asking price. Specifically, there is nothing in record to indicate what the value of the property without the contaminated soil might have been and, therefore, there is nothing in the record against which to measure the significance or relevance of the Site's diminished sale price. Accordingly, based on the current state of the record, this Court cannot determine as a matter of law whether defendant had reason to know of the PCB-contaminated soil at the time defendant acquired the Site. Obviously Lombardi's credibility is at issue here so there are material issues of fact in dispute regarding defendant's pre-sale knowledge

which must be resolved at trial by the fact finder.

Similarly, there are genuine issues of fact regarding whether defendant undertook all appropriate inquiry into Allen's ownership and uses of the property. As aforementioned, in order to protect itself from liability utilizing the innocent landowner defense, defendant must prove by a preponderance of the evidence that it undertook all appropriate inquiry into Allen's use of the property. *See* 42 U.S.C. § 9601(35)(B). This undertaking, furthermore, must be made utilizing good commercial or customary practice, and the Court may consider any specialized experience or knowledge in determining whether defendant has met its burden. *See id.* In this case, the parties dispute whether defendant is a commercial and residential property developer and management company or whether it is simply a commercial and residential property management company. Furthermore, what *is* good commercial or customary practice for a commercial real estate manager, or developer for that matter, has not been established in the record before the Court. *See Advanced Tech. Corp. v. Eliskim, Inc.*, 87 F.Supp.2d 780, 785 (N.D.Ohio 2000) (noting that "[w]hat constitutes appropriate inquiry is a mixed question of law and fact and will depend on the totality of the circumstances"). Thus, whether defendant undertook an appropriate inquiry into Allen's previous ownership and use of the Site in light of the company's experience, skill, and knowledge is a disputed question of fact to be resolved at trial.

b. The Due Care Requirement of the Innocent Landowner Defense

In order for defendant to prove the due care element of the innocent landowner defense, "defendant must demonstrate that he took all precautions with respect to the [contaminated soil] that a similarly situated reasonable and prudent person

would have taken in light of all the relevant facts and circumstances." *DiBiase,* 1993 WL 729662, at *7. Case law analyzing this prong of the innocent landowner defense emphasizes that under no circumstances will "no care" be considered "due care." *See id.* Indeed, "[w]hile the statute does not require landowners to exercise due care *before* they know of the presence of hazardous substances, it *does* require that once landowners are aware of the threat, they take some action." *Containerport,* 128 F.Supp.2d at 480 (emphasis added).

Here, defendant argues that it has satisfied the due care requirement of the innocent landowner defense because once defendant became aware of the contamination, it had the contaminated soil excavated and placed on polyplastic. Defendant further asserts that although the polyplastic cover blew off the two piles of contaminated soil, the soil could not get into either the land or the "ambient" air.

EPA, on the other hand, argues that defendant did not exercise due care because although defendant excavated the contaminated soil and had it placed on polyplastic, the piles were not removed from defendant's property until five and a half years after defendant had the soil excavated. According to EPA, sometime between the time the soil was excavated and EPA's Removal Action, the polyplastic that covered the PCB-contaminated soil piles blew off, thereby exposing the soil to the elements. EPA contends that the exposure of the contaminated soil to the elements not only threatened dispersal of the uncovered piles of contaminated soil but also left the piles readily accessible to people and animals.

Viewing the evidence and related inferences in the light most favorable to defendant, this Court cannot conclude as a matter of law that defendant did not exercise due care with regard to the contaminated piles. In this case, defendant *did* take affirmative steps to rectify the Site's hazardous waste problem. The issue is whether a similarly situated reasonable and prudent person would have taken the same steps or additional ones in light of all of the relevant facts and circumstances. *See DiBiase,* 1993 WL 729662, at *7.

In addition, even assuming, *arguendo,* that defendant is found liable to pay for the removal of the seventy tons of contaminated soil it had previously excavated and placed in two piles on the Site, that does not automatically make defendant liable for EPA's removal of the other approximately eight hundred and thirty tons of previously undetected PCBs on the Site. In other words, defendant may be able to take advantage of the innocent landowner defense for PCBs removed by EPA other than the seventy tons of contaminated soil defendant had excavated and placed on polyplastic in October 1989. As demonstrated by the foregoing, therefore, there are issues of material fact regarding whether defendant exercised due care once it became aware of the contaminated soil, which cannot be resolved based on the current state of the record.

## IV. CONCLUSION

The determination of whether, under the particular circumstances, defendant satisfies the requirements of the innocent landowner defense involves factual issues that this Court cannot resolve on the current state of the record. Defendant, therefore, must be given an opportunity to develop its innocent landowner defense at trial. Furthermore, in the event that defendant is unable to prove its eligibility to utilize the innocent landowner defense, EPA must be given an opportunity to prove the amount of damages it is entitled to recover from defendant. Therefore, in this case, the bottom line is that this Court can grant only partial summary judgment in favor of EPA.

To clarify, the Court's grant of partial summary judgment for EPA leaves only two issues to be litigated at trial: (1) whether defendant may utilize the innocent landowner defense to avoid CERCLA liability and (2) if defendant is found liable, what damages EPA has incurred as a result of its Removal Action. *See Russell v. Enterprise Rent–A–Car Co. of RI*, 160 F.Supp.2d 239, 248–49 (D.R.I.2001) (noting that the Federal Rules of Civil Procedure permit a court to devise an appropriate order directing further proceedings when judgment is not rendered upon the whole case and material facts are disputed); *Access Solutions Int'l, Inc. v. Data/Ware Dev., Inc.*, 70 F.Supp.2d 92, 95–96 (D.R.I. 1999) ("Rule 56(d) arms the court with a tool to 'narrow the factual issues for trial.'" (citation omitted)). Accordingly, this matter will be scheduled for trial to resolve the limited issues remaining for disposition of this matter.

It is so ordered.